We don't do that here. We're in Philadelphia. Different story. How are you doing, Counsel? Hello, Your Honor. I'm sorry. I just had to stop for a minute. No worries. We're talking about a different time and a different place. So let's have you proceed, please. Absolutely. May it please the Court. Stephen O'Hanlon for Appellant Samuel Beto. Good afternoon, Your Honor. This is an appeal from dismissal at 12B6 level. Yes, it is. And would you like to reserve some time? Yes, Your Honor. I spoke to the clerk earlier. If I could reserve two minutes for rebuttal. Okay. Very good. Go ahead, sir. Your Honor, Appellant Samuel Beto was incarcerated in both the Commonwealth of Pennsylvania systems and in the federal system. According to the complaint, he served in excess of 689 days over his max dates, which is attributable to all defendants. He never had a due process hearing, and there was a continuing detainer that stayed on Mr. Beto for in excess of 17 years while he was transferred from the Commonwealth of Pennsylvania state system to the federal system. Is there a theory why it's a continuing violation, because the detainer remained lodged? Yes, Your Honor. How do you reconcile that with, I think it's Caldwell, where I think there was a lien put on a piece of property, and that was not, the moment the lien was placed was the trigger event for the cause of action, not the continuing presence. Because the theory of continuing violation requires affirmative action into the statute of limitations. So how do you reconcile that? Your Honor, I believe that the case that the court below and also the Commonwealth of Pennsylvania cited was the Cowell case, and I addressed that in my appellate brief. I can't remember if it was a lien or if it was something to do with denial of a driver's license. I think it was something along those lines. And the court below cited Cowell for the proposition that without taking affirmative action, there's no continuing violation. Your Honor, as Your Honor pointed out, my position would be that a continuing detainer is an affirmative action because the detainer by itself is an instrument that is taking action. But moreover, Your Honor, with regard to appellant, he went through multiple internal grievances with the state system. When he was in federal custody, he continued to file grievances with the state system. Both him and his wife wrote to several of the appellees. Just a question about the time that you're in federal custody. So we're dealing with this 120-day limit, and I'm wondering if I'm not looking at this the right way. If you assume for a moment that the PBPB received official verification of Beto's federal conviction on October 26th of 98, he begins to serve his sentence in November of 98. He returns to state custody in March of 2003, and he receives a parole revocation hearing on May 9th of 2013. I'm wondering if I'm looking at it incorrectly if I say that the time period from October to November is a number of days, the time period from March of 2013 to May 2013 is a number of days. If you take those two periods of time, add them together, it's less than 120 days. Is that not the way to look at this? I don't believe that is correct, Your Honor. I think even appellees conceded that they went more than 40 days beyond the 120-day limit. And this is addressed by the trial court in its opinion on footnote 5 on page 4 of the trial court's opinion. But moreover, Your Honor, with regard to Mr. Beto, the appellant in this case, his position is that he should have had a probable cause hearing within 14 days rather than 120 days. Didn't the federal indictment take care of that probable cause determination? Isn't that why that 14-day period was found unnecessary? Didn't he have that hearing? Well, I don't know because he never had any timely hearing. But that was certainly the determination of appellee Conjor. But it is appellant's position that the federal indictment by itself does not establish probable cause alone because Mr. Beto entered a plea of not guilty at his initial. But the plea of guilt is a beyond reasonable doubt phase or the guilt finding. We're only talking about probable cause. An indictment is a probable cause determination. And in any event, if the complaint by Mr. Beto is about the 14 days, I didn't have a hearing within 14 days, that certainly is time barred. Wouldn't you agree that's 16, 17 years between that 14-day period and the complaint? So are you still pursuing that as part of his cause of action, is he didn't give me a probable cause determination in 14 days? Your Honor, that denial of procedural due process is still part of his claims and it's still something that we're pursuing because he was never actually harmed by that lack of a probable cause hearing until he was brought back into the state system. And that was a surprise to him. It was a surprise to people at USP Lewisburg that he was being brought back to the state system. Can we go back to my question for a moment? Yes. Tell me why the calculation that I proposed to you is incorrect. Because if the period of time from official verification to the beginning of his federal sentence is X, and the period of time from going back to state custody to the parole revocation is Y, and X plus Y is less than 120 days, why is there overdetention? Your Honor, the period that I have is that he was brought back into the state system on March 26th of 1998. He remained in the state system until 10-21 of 1998. Then he was released from Lewisburg on March 1st of 2013, immediately transported to SCI Cole Township. If I could just have one second, Your Honor. Yes. Yes. And he didn't have his hearing. It was May 9th. Does that sound right? Yes, until May 9th of 2013. But don't we begin the time clock at official verification or am I wrong about that? Well, that is one of the arguments that a parent makes, is that if probable cause is only established at time of official verification, then there was no basis for holding him for this period between March 1st of 2013, sorry, between March 26th of 1998 until October 31st of 1998, when he was always held in the state system. How do you reconcile the Commonwealth Court's order that said the 120-day period within which to have a hearing begins to run when he's returned back to state custody, that order from 2007? Well, doesn't that really almost absolve activity that occurs prior to that because the Commonwealth Court at least shows the defendants aren't really indifferent because they had a court order that said you don't really need to do anything until he returns and must do something within 120 days of his return. I understand, Your Honor. But the Commonwealth Court has said that Mr. Bito's, the appellant's, claims were premature and that is contradictory to the discovery and continuing violation theory that the appellees try to advance now, in that even if we get around all of this procedural due process issue, there is the issue that appellee board said on October 21st of 1998 that appellant had maxed out his state sentence and nonetheless there was this continuing detainer that continued while Mr. Bito, the appellant, was transferred from the state system back to the federal system and back to the state system again. You say there's something in the record where Mr. Ward said he maxed out? Yes. Where is that in the record? That is contained in an exhibit which was attached to appellant's response to the first motion to dismiss that was filed by appellees, Your Honor. Where he said those words. It wasn't just an indication, like I've seen all the exhibits and there's a little indication on the top that identifies the maximum periods. Yes, I believe. So, tell me which document. Can you describe it for me? Yes, it's an exhibit that was attached. It's a document that says that the state detainer was lifted and I know which one you're talking about. Thank you. Okay. In addition, Your Honors, once Mr. Bito was brought back to the state system, I think the court below erred by giving every reasonable inference in favor of appellees rather than appellant. Can we focus on, let's talk about those, that part of the opinion. Absolutely. I want to focus, if you don't mind, on the people who hold titles like parole agent and hearing examiner. Yes, Your Honor. Because the others, there's some question about who knew what when, etc. But focusing on these three, what in the pleadings would have allowed the district court judge to infer that the parole agents or the hearing examiner had any authority within their role to take action on behalf of Mr. Bito? Because it appears at least the allegations are they all had notice of his contention about the oversight. Where the others are sort of a question of who knew what. So focusing on those three, what could the district court have looked at to have connected that knowledge with their action or inaction, and we'll talk more specifically, that they had the authority to even do anything. So educate me on that. Right. Well, Your Honor, this goes to something that was not addressed in any detail by the district court or by appellees in their brief, and that was that Mr. Bito, the appellant, repeatedly pled that he had ongoing grievances and submitted several grievances to all of the appellees in this period, the 2013 on period, Your Honor. So with regard to all of these people, whether or not they had the power to take action, once they knew that there was an illegal sentence, they either had power individually or in conjunction with superiors or other people within the parole board, once they were informed that Mr. Bito was serving an illegal sentence to take action. So that's why we should focus on paragraph 8. Is that where we should look to for the causal connections here on the deliberate indifference? This is paragraph 8 of the second amended complaint, Your Honor. Yes. Your Honor, in appellant's brief, and this is the brief from pages 35 through to 38, there are multiple allegations, and I refer the court specifically to paragraphs 31, 32, and 34, which make specific allegations about how all of these appellees were informed that Mr. Bito was being detained beyond his maximum date. And for the benefit of the record, those allegations go to Ms. Del Moro, Mr. Duda, and Mr. DeSouza. Yes. So we're talking about the same parties. And so I acknowledge the allegations are that they were all on notice of the overstay assertion. My question is, from this material, how could the district court conclude it was reasonable to infer they had the authority to assist him in some way? And I'll tell you why I ask this, because the way that the Eighth Amendment elements are that are for this type of cause of action, there seems to be a focus of a consideration on what roles and responsibility the defendant actor had. Could they have effectuated some change? Right. Now, there was a district court decision based upon a declaration submitted there where a district court judge said, at least based on that declaration, the parole agent didn't have the authority to do anything on sentencing calculation. Okay, so I recognize that had a factual record, not the pleadings. But my question is, what could the district court have gleaned from these allegations to know these folks could have done something for him? My time is up, but if I could just answer your question. There are repeated allegations in the Second Amendment complaint by the appellant that all of these people, whether working alone or in conjunction with others, had the power to take action to correct the illegal sentence that appellant was serving. And are you leaning on things like Mr. Duda is a hearing examiner. He could be on the parole board, and they get to make the decision on who's committed. Are you relying on things like Mr. Murrow told Mr. Beto, you've got to contact somebody in the field, and by the way, who is that? Do you know to whom they're referring? I do not know off the top of my head. Are you leaning on those allegations as your basis to say he must have had some authority to do something because of what their jobs were? What more can we lean on from this pleading? Yes, there are their jobs, but moreover, the roles of their jobs, which are detailed in the paragraphs that I just cited to, which they act as liaison between the state prison and the Department of Probation and Parole, and they're the only people who can effectuate release or at least work with their colleagues and supervisors if they are informed of an illegal sentence, and they're the only people, moreover, Your Honor, that appellant knows of to report to. So that puts them in a different category than all the other parties that you have named as defendants. Is that fair to say? It's fair to say with the claims from when he was returned to the state system, the people earlier on, obviously, because they had much higher titles and much more active roles and ability to be able to sign off on things, like appellees Ward and Bushy, obviously had higher titles and therefore more power, but it's still appellant's contention that all of these other appellees that were named in the later period had the power either because of their roles that were described in the Second Amendment complaint or working in conjunction with colleagues or supervisors, thereby had the power to do something about the allegations that Mr. Beto, the appellant, repeatedly made. Just a quick question, if I may. Back to the Commonwealth Court. When Mr. Beto brought that action, he was making the allegation that he should be discharged from custody, was he not? From state custody. He was in federal custody. He was in federal custody, but that the detainer should be lifted. Yes. And the board, I'm sorry, the court ruled that the board simply must hold a revocation hearing within 120 days of his being returned to federal custody. They didn't say that they weren't determining the issue, as I think you said a moment ago in your argument. Well, I believe that they said that Mr. Beto's complaints against the parole board were premature because he still hadn't been returned to state custody and therefore hadn't gone over his maximum date prior to being returned there. But I don't believe that they addressed the issues dating back to 1998, in particular with regard to appellees Ward and Bushey ordering that the detainer should be lifted because Mr. Beto had maxed out on his state sentence. Wasn't it the premise of Mr. Beto's claim before the Commonwealth Court that it was an illegal detainer that he was facing? Yes, it was. And it was part of his claim, Your Honor. And the Commonwealth Court said, well, they didn't fully address all of Mr. Beto's claims, but they said that his allegations were premature because he was in federal custody when he filed the Commonwealth Court brief. Let me ask you this question. Yes, Your Honor. Does Heckley Humphrey bar your Eighth Amendment claim since you bring in 1983 action challenging the fact or duration of your client's confinement and the success on that claim would seem to implicitly call into question his confinement? Your Honor, Heckley Humphrey wouldn't bar Mr. Beto's claims because... No, only his Eighth Amendment claim, not his Fourteenth Amendment claim. Right. With regard to appellant, however, it's his position that the fact that he was over his maximum date was clear that even when he was returned to the state system, it took an inordinate amount of time for any kind of hearing to occur. The fact that appellees Bushey and Ward said that he maxed out his state sentence and lifted the detainer in October of 1998, it's without any basis and therefore inexplicable that given that the detainer was lifted and the sentence was deemed to have been completed, that the sentence continued for another approximately 25 years. I know I found the document you're referring to. I see the document saying that they're cancelling the enforcement of the warrant to commit and detain, but I don't see anything in this document that says the reason. And you represented that the reason was because it was an overstay. I don't see anything in this document communicating that. I can't remember the... And just for the record, it's 287A. Go ahead. I understand, Your Honor. I believe that that document indicated that the... Well, I don't wish to misrepresent anything, first of all, but I believe that the fact that that document determined that the detainer had to be lifted was an indication by Mr. Ward that the sentence was terminated. And the reason I believe that was because according to appellant, he had maxed out by that time. I understand your position. Thank you. Thank you, Your Honor. Thank you. Thank you. May it please the Court. My name is John Noll. I'm with the Pennsylvania Attorney General's Office, and I represent the state officials who are the appellees in this matter. I think the most important element in this appeal,   with Judge Simandl and Judge Schwartz, is the Commonwealth Court's decision. Commonwealth Court said the 120-day period doesn't run, doesn't begin to run, until Mr. Vita was returned to state custody. And I think that that really does dispose of the case. In an Eighth Amendment claim, we're very often focused on what we call the subjective prong. Was there deliberate indifference by the defendants to some risk of harm? But there's also an objective prong. There has to actually be a serious risk of harm. And that is what is missing, or one of the things missing in this case. Commonwealth Court said the 120-day rule doesn't start to run until he's back in our custody, and therefore he was not kept beyond his proper release date. Now, up to a point. Mr. Vita's legal theory, the one that he presented here in the Commonwealth Court, is perfectly sound. If the board had blown the 120-day deadline, then Mr. Vita would have been entitled to have his parole violation charges dismissed. There would have been no grounds for a detainer when he was in federal custody, and all the rest of the consequences would have flowed. But that's not correct. The 120-day rule did not begin to run until he was back in our custody. And the court actually need go no further than that to decide this case. So your position is even if we have that 120-day, we have the order of the Commonwealth Police Court, but there was no time left on his parole status to serve in prison. He maxed out. He would still have to wait three months to have a hearing. Even if adjudicated to be found in violation of a parole term, there would be no time for him to serve because he was done months earlier. But that would never be correct, Judge Schwartz, because once you violate parole, you at least potentially lose credit for all of your street time. I see. I understand. So Mr. Vita was facing a possibility of another five and a half years, because that was the time he was on parole before he violated, at the board's discretion. So you're saying that the max outdates that we might see on some of the documents here assume he's not going to lose those time on the street. Is that right? I think that may be the case. I see. I understand. Okay. So the official verification date has nothing to do with the calculation of the 120 days. It begins, if I understood you correctly, in March of 2003 and would end on the day he had his parole verification hearing in May. In this case, it does not, because he was at that time not in our custody. Had he been sentenced on a state charge to state prison, then when we got the official verification, that would have started the 120-day clock on the parole violation. But because he was in federal custody at that time, it didn't begin until he gets back to us, which, of course, makes sense, because that's the only way that he can participate in the parole verification hearing is if he's in our custody. I don't know whether you'll know the answer to this question on this issue of losing credit for the street time. Assuming it's 680-plus days that are represented in the briefs of overstay time, if he had been adjudicated guilty of a parole violation and the parole board decided we're going to no longer give you credit for that street time, could this be a circumstance where there was no, quote, overstay? Is that how the math would work out here? I know it's complicated by the departure from the state system, the 15-plus years, and the federal system in return, but do you know the answer to that? Well, what I can tell you is that he potentially could have had to serve another five-and-a-half years, which is a lot more than 600 days. I see. I'm not sure where that 600-day period comes from. I think that Mr. Vito is including in that time time where he says he would have been in a federal halfway house, but he wasn't because of the detainer. It's not that he was kept in state custody for 600 days longer than he should have. I think part of that is the federal thing. I'm still confused about something. If he alleges that he was held in state custody, and I think counsel repeated this, March 26th of 98 to October 21st of 98 without a parole violation hearing, I hear you when you say you can't count the time that he's in federal custody. Totally, I get that. But for that period of time, he's not in federal custody. So why doesn't that count towards 120 days? Well, the March date that you mentioned, that was the date that he was pinned. Well, he surrendered himself to his parole agent after having had his federal, I guess it's a preliminary hearing. We're not really sure. The time period would run from when we get official verification of his guilty plea, and we're not really sure based on the complaint when that was. In the complaint, he says the official verification date is October 26th. That's the date of his sentencing. That is when we think the earliest it could be. Mr. Beto thinks that that verification occurred earlier. But by October 26th, he was already in federal custody? By that time, he was already in federal custody. He had been in federal custody for several days at that point. And I grant you that some of these calculations can be a little murky. The circumstances here are a little unusual because Mr. Beto entered a guilty plea and then tried to withdraw it, and then apparently tried to withdraw the withdrawal. And Mr. O'Hanlon and I could argue back and forth about this all day, but this was the very theory, the theory that Mr. O'Hanlon is presenting now, that was presented to common law court, and they decided it. They decided that this is the proper interpretation of these regulations as applied to Mr. Beto, that the 120-day clock starts to run when he's back in state custody. If I could ask about the parole agent and the hearing examiner, you heard me ask those questions to your adversary. What in the pleadings could we draw from to be educated about what their roles and responsibilities are? And, again, I'm leaning on the Eighth Amendment language from our cases in these overstay scenarios. I don't think there's very much that you can rely on in terms of parole agent. With respect to the hearing examiner, of course, it was the hearing examiner's responsibility to hold the parole revocation hearing. And I believe there's a document in the record that said, where the hearing examiner says, if you think there's a timeliness problem, bring it up at your hearing. So I suppose in that sense, it was the hearing examiner's responsibility to do something, and he did. He held the hearing, and the result of that hearing was Mr. Beto was not charged with the five-and-a-half years of back time that he could have been. So from your point of view, the hearing examiner has noticed the Davis hearing, which is that May 2013 period, and there's a ruling by the board in July, right, July of 2013? I think, yes, I think the ruling was by the hearing examiner. By the hearing examiner. It didn't have to go to the full board? I'm sorry? It didn't have to go to a three-member board? I believe that's true. And so from your point of view, is that a reasonable period for somebody who's contending they shouldn't have been in custody for all that time? Yes, the hearing examiner did what he was supposed to do. He held a hearing within the appropriate period of time, and he issued a decision. And what about the two parole agents? We have Ms. Del Mora who says, who responds to the grievance, and she says, her information, quote, came from the field, and that's who she'd contact. Do you have any understanding of what the field refers to in that? No, I'm afraid I don't. Communication? I'm afraid I don't. So how is it that we can say that Ms. Del Mora was acting dutifully in following up on that complaint if none of us know what she was talking about? If we don't know, then how did Mr. Vito know? Well, I don't think you ever have to get to Judge Schwartz. Tell me why. Because we know that he was, in fact, not held beyond his time. So when we say, was she deliberately indifferent, well, deliberately indifferent to what exactly? Since, in fact, there was no actual harm being done to Mr. Vito, it's a little hard to have a meaningful discussion of whether people were deliberately indifferent to the harm that didn't exist. All right, well, then let's assume for a moment the following. Let's assume for a moment over-detainment, right? That's an assumption we're going to go with. I'm sorry, what was the assumption again? That he was over-detained, right? Sure. It's an alternate universe from your perspective, right? So let's assume he's over-detained, and he brought that over-detention to the purview of every official that he could think of that might have something to do with it, which is, I think, obviously from their perspective, what's presented in the complaint. Why is that deficient? What is it that someone who is over-detained has to do in your perspective that is not done here? I think assuming that he was, in fact, being over-detained, I think it is quite likely that one of those defendants would have been in a position to do something. I'm not certain, but I think it would have depended upon the timing. If we're talking about the period right after he's returned to state custody, we have a hearing examiner who's been assigned, who's responsible. A hearing is scheduled, and he's going to have it. That would be obviously the hearing examiner's responsibility. If we're talking about years and years earlier, I'm not quite sure who would be in a position to do that. But probably the board itself would be the appropriate entity to undo the detainer, assuming that it was improper. Okay. So the board or the hearing officers. Okay. If I could just follow up on that. But on the board defendants, I thought the position was that there were letters sent to the board defendants, but there was no allegation they received them. But I gather you're distinguishing those board defendants from board defendants like Mr. Ward who signed the detainer. Is that your distinction? Yes. I'm speaking about the actual members of the Board of Probation and Parole. Not just the secretary, not some official. I understand your distinction. Thank you. I don't know if we'll get to that point or not, but where the pleading says, I sent something to this individual, isn't there a presumption that it was received, and isn't it fair to assume that the person thereby had knowledge? Does the district court's opinion negate that favorable assumption? I think it does. I think in all candor that the district court went a little too far in that respect. I don't think it undermines soundness of the result, but, yes, I think you're right. And I appreciate the candor. That really was what I planned to cover today. I can address any questions about the statute of limitations if you wish, but I was going to leave that to the brief. Actually, talk about HEC for a moment. I'm sorry, talk about it. Do you think there's a HEC bar on his 8th Amendment claims? HEC can be, I'm not sure I would want to take the position to write off the top of my head. I don't think we've. No, it wasn't. We didn't brief it. HEC can be a very difficult decision to apply, and I'm not quite sure what the answer to that would be. Fair enough. Which may be one of the reasons we didn't brief it. Your adversary, I hope you want to talk about the statute of limitations for a moment, your adversary said the lobbying of the detainer constitutes its presence every single day is an affirmative act. How do you respond to that? Well, that seems to me a paradigm case of a continuing effect of an initial action. That's not a continuing practice or a continuing violation. That's just the ongoing effects of what was done many years ago in the past. Would you agree, though, that the first day of unlawful confinement that's being alleged would have been the first day that he was returned to state custody because the detainer should not have been issued in the first place under the plaintiff's theory? I am not really sure when Mr. Vito contends the first day of illegal custody is. Well, if it was in 2013. I'm sorry. If it was in 2013, if the complaint is somehow severable into things that happened in 1998 and things that happened in 2013, then obviously the 2013 things are not time barred. Sure. And the first real harm, if one is complaining about unlawful detention, would have been that first day in state custody in 2013, would it not? Yes. His contention is that when he was returned to state custody in 2013, that was at least the first day of illegal detention, if not going back to 1998. And so if that's harm that's actionable, the question becomes who is it actionable against? Can it relate back to the 1998 conduct? Because that was a foreseeable consequence of what was put in motion in 1998, even though there were not intervening actions. We're speaking in terms of the limitations issue now? The limitations issue, the continuing violation theory. Well, again, it's a continuing effect of an initial decision. And Mr. Vito certainly knew at least some of those consequences. After all, that's why he filed his name as petition. That is why, I mean, he can't very well say, you know, I deluged these defendants with letters and petitions and this and that since 1998, and, therefore, they knew I was being kept illegally, but I didn't know it. Well, that's a discovery. That's your reason why the discovery rule doesn't apply. Sure. But Judge Samandel is asking about the continuing violation doctrine. Well, again, it's just a continuing effect. The fact that the detainer was placed in 1998 means that, I mean, that's what a detainer is. It meant that when he finished his federal custody, he could be returned to the state. But I don't think that that makes the person who placed the detainer in 1998 suable in 2013. Would there be no redress then for a mistake that was made more, or for action that was taken more than two years ago than it has the effect of detaining somebody today? Well, the redress would be to take action as soon as you know about the problem to get that detainer removed, which is exactly what Mr. Beto did. I suppose, alternatively, he could have filed a federal action for declaratory and injunctive relief about the detainer. As it was, he chose to end amnesty, which, assuming his theory was correct, was a perfectly appropriate way to go. I see my time now has expired. All right. Thank you. Thank you, Your Honours. Your Honours, with regard to the Commonwealth Court opinion, and the trial court, in its opinion, did not, you know, decided that it would not address the Commonwealth Court's opinion in any great detail because regardless of what the Commonwealth Court said, the trial court below deemed that everything was time-barred. So Mr. Beto's position below and the effect of the Commonwealth Court's decision doesn't preclude Mr. Beto from bringing his Eighth Amendment claims here. With regard to the confirmation of his guilty plea when he was in federal custody and the trial court addresses this as well, his federal plea was on May 11th of 1998 and the court below cites the docket number and this is in the joint appendices at 6A. So Mr. Beto's position would be that he should have had his 120-day probable cause hearing within 120 days of that time. But that doesn't prove official verification. That just proves when an event happened. Yes, Your Honours. And I would imagine the importance of the official verification component is to make sure there's good, sound notice so the parole board is acting on real events. So I don't know that we can necessarily infer from the pleadings that official notification was tendered on May 11th, unless there's something in the pleading you can point us to. Well, Your Honours, my position and Appellant's position would obviously be that that would be a matter of something that Appellant did not know of, that could not have known of because he didn't receive that notice himself. But it would have been sometime soon after his plea occurred in federal court and prior to the time when he was transported to federal custody. Let's assume that's correct. Right. You have to demonstrate for the S. Amendment claim it's deliberate indifference. Right. How can we say that this collection of defendants after 2013 were deliberately indifferent when they had the Commonwealth Court's order saying no action needs to be taken for 120 days until he returns? So we do have to look at what information was available to them to see whether or not they were indifferent either objectively or subjectively. Well, Your Honour, because Mr. Vito, the Appellant here, pointed them to Mr. Ward's order lifting the detainer in October of 1998. So given that Mr. Ward and Mr. Bushey, the Appellant here, lifted the detainer, there was no reason whatsoever why the detainer continued into the following century other than Mr. Ward and Mr. Bushey having received ongoing complaints from the Appellant and Appellant's wife notifying them that the detainer had been lifted officially but nevertheless substantively continued to exist despite it having been lifted by these people who had the power to lift the detainer. So you're saying the grievances to Mr. Ward and Mr. Bushey continued after 1998 and after 2000? I thought the grievances went to other people during that period, but not those two. I thought those contacts with them ceased and he moved on to others to raise this issue with. With regard to Bushey and Condor, Your Honour, and this is, sorry, with regard to Ward and Condor, Your Honour, there were complaints that continued into 2000 with regard to Ward and also with regard to Bushey there were complaints that continued beyond the initial 1998 period. My point is, though, after that period ended, the next group of defendants had in front of them presumably this 2007 order. And so doesn't that provide them a basis for saying, we weren't indifferent to your needs, we have a court order saying you don't have to have a hearing for 120 days until you return. And he got that within 120 days of his return. So doesn't that undermine the ability of pleading that they were deliberately indifferent? Your Honour, first of all, the Commonwealth Court's order was never substantively addressed by the court below in this case. Your Honour, I don't know the effects that it would have had on the latter appellees and the defendants below, but what I do know is that appellants continued to put these people on notice regardless of the Commonwealth Court's order. And if there is a continuing violation, harm doctrine, duty upon appellant to exhaust administrative remedies and so on, then regardless of the Commonwealth Court's order, there has to be some kind of individualized response to appellant's claims if appellant's claims have merit, which appellant obviously believes that they do. Thank you. Thank you for your time, Your Honour. Thank you, Counsel. This court will take it under advisement. This court stands adjourned until Thursday, March 16th at 9.30 a.m.